**COMPAGNIE DU PORT DE RIO DE JANEIRO v. MEAD MORRISON MFG. CO.**

District Court, D. Maine, S. D.  April 14, 1927.

No. 741.

**1. Constitutional law ⬦⟶315—Foreign judgment, to be enforceable in court of United States, must have been rendered on service which is due process of law (Const. Amend. 14).**

A judgment of a court of a foreign country, to be recognized and enforced by a court by the United States, must have been rendered on service of process which is due process of law, within the federal Constitution (Const. Amend. 14), and in an action on such judgment the question is always open to inquiry.

**2. Judgment ⬦⟶831—Rule of comity between United States and foreign countries is substantially same as established by the Constitution between states (Const. art. 4, § 1).**

The "full faith and credit" provision of the Constitution (article 4, § 1) merely establishes the rule of comity between the states, which is recognized, under the decisions of the Supreme Court, as between the United States and foreign countries.

**3. Judgment ⬦⟶831—In action on foreign judgment, where jurisdiction is not shown by record, the question must be determined by proofs.**

Where it appears by the judgment roll itself of a foreign judgment sued on in a court of the United States that the action was defaulted without appearance, and that the only service made was on a third person, who refused the summons on the ground that he had no authority to receive it, any presumption of jurisdiction is sufficiently overcome by the record itself to throw the matter open to proof, and leave the court free to determine from all the evidence whether jurisdictional facts existed according to its view of due process of law.

**4. Corporations ⬦⟶662—American corporation held not present or "doing business" in foreign country, so as to be subject to suit therein.**

A corporation of a state, having its principal place of business in the United States, under a contract built a pier in Rio de Janeiro, but after its completion did no other business in that country. Held that, three years later, when it was sued in a court of Brazil for breach of the contract, it was not "doing business" at present in that country, in such sense as to be subject to the local jurisdiction.

**5. Corporations ⬦⟶642(7)—Engaging in litigation in foreign state or country is not "doing business" therein.**

A corporation, by engaging in litigation in a foreign state or country, is not doing business in such sense as to render it subject to suit therein.

**6. Contracts ⬦⟶322(1)—Burden held to rest on plaintiff to show that damage from breaking down of pier was due to breach of builder's contract.**

In an action for damages resulting from the breaking down of a pier built by defendant un-der contract, the work being done under supervision of plaintiff's engineer, and inspected, accepted and paid for long before the accident, the burden of proof rests on plaintiff to show that the collapse was due to breach of the contract, as distinguished from fault of the contract.

**7. Contracts ⬦⟶322(4)—Collapse of pier held not fault of contractor.**

Collapse of pier built by defendant *held* not due to any act of defendant, not required or authorized by the contract.

At Law. Action by the Compagnie du Port de Rio de Janeiro against the Mead Morrison Manufacturing Company. Judgment for defendant.

Verrill, Hale, Booth & Ives, of Portland, Me., Wm. R. Pattangall, of Augusta, Me., and H. Starr Giddings, of New York City, for plaintiff.

Cook, Hutchinson & Pierce, of Portland, Me., Edward F. McClennen, George L. Mayberry, and Arthur P. French, all of Boston, Mass., for defendant.

PETERS, District Judge. In this action the plaintiff seeks to recover damages for the collapse of a pier and coal-loading apparatus constructed at Rio de Janeiro for the plaintiff by the defendant. The work, which was performed by subcontractors under defendant, was begun early in 1913, and completed, delivered to, and accepted by the plaintiff in October of that year. The construction was largely of concrete, including concrete piles supporting a floor which was supposed to carry a load of 5,500 tons. The pier was 410 feet long, 51 feet in width, and, with the superstructure, cost approximately $450,000. On June 10, 1915, the first time the pier was loaded to anything like its agreed capacity, having at the time a load of about 4,000 tons of coal, it collapsed in the middle and was largely wrecked.

As the written contract under which the work was done was made and was to be wholly performed in Rio de Janeiro, the law of Brazil applies.

The plaintiff, a French corporation, held a concession from the Brazilian government to build and use this pier under an arrangement whereby it was later to become the property of Brazil.

The defendant is a Maine corporation, having its office and transacting its usual business in Boston.

In the year following the collapse of the pier the plaintiff, frequently referred to as the Port Company, brought an action against the defendant, Mead Morrison Manufacturing Company, in the federal court of Brazil, a court corresponding very closely to this

court, and in that action judgment was rendered for the plaintiff by default.

The plaintiff brings its action of assumpsit in this court, and in the fifth count of its writ seeks to recover on the Brazilian judgment. In various other counts the plaintiff seeks relief on other grounds; but, at the trial without a jury, it was thought to be expedient to first consider and decide all questions arising under the fifth count, on the foreign judgment, and then take out the evidence on the other counts if necessary. ·

After a hearing on the fifth count, I ruled temporarily that the action could not be maintained on that alone, and the trial proceeded on the merits under all other counts. The plaintiff's counsel, however, insisting that the foreign judgment and the proceedings leading up to it meet all legal requirements, and that the plaintiff is entitled to recover on it without further inquiry into the merits, have filed a notably able and elaborate brief, and on account of the importance of the matter I have reviewed this branch of the case, and find the pertinent facts and the law as follows:

The plaintiff offered in evidence the judgment roll of the federal court of Brazil. I find this to be sufficiently authenticated, and from it and from other evidence it appears that it is permissible under the Brazilian Code to institute a judicial inquiry into the cause of an accident of this kind immediately after its happening. The proceeding is called a "vistoria," and seems to be a combination of inquest, arbitration, and deposition in perpetuam. A board is constituted, consisting of three experts, one chosen by each party and the third selected by the judge from names submitted by the parties, which proceeds at once to investigate the cause of the accident and make a report to the court, which, if a suit is brought later, can be used as evidence.

In this case a petition for a vistoria was filed by the Port Company on June 11, 1915, the day after the accident. On June 12th citation was served on F. H. Walter & Co., of Rio, on the theory that they were agents of Mead Morrison Manufacturing Company, the defendant. It is denied by the defendant that Walter & Co. were its agents for the service of process, and for this and other reasons it is claimed that the vistoria proceedings are nugatory.

Legal experts in Brazilian law, called by the defendant, testified that the vistoria proceedings in this case where wholly void under the law of that country. Other Brazilian experts, called by the plaintiff, testified directly to the contrary.

However, the federal court of Brazil evidently considered the vistoria to be regular, and from a North American viewpoint it would seem that it should be so regarded, largely from the fact that the manager of the defendant participated in it and tried to get a finding in his favor on the merits.

Assuming, for the purposes of the discussion, that the vistoria was legal under local law, it appears from the record that the experts made a careful investigation, and on April 29, 1916, made a report holding the defendant responsible, from a technical standpoint, for the collapse of the pier. From this point the defendant, and all persons possibly acting for it,· withdrew from active, voluntary participation in the local proceedings, and had· no further connection or contact in Brazil with the matter, except as mentioned below, and except that, following the report of the experts, the plaintiff wrote Walter & Co., ·asking whether Mead Morrison Manufacturing Company intended to make a settlement without suit. Whereupon Walter & Co. replied that they would ascertain the defendant's intention, and subsequently the defendant wrote Walter & Co., refusing to accept responsibility for the collapse, which letter was transmitted to the plaintiff August 24, 1916.

On September 4, 1916, suit was begun in the federal court of Brazil by Compagnie du Port de Rio de Janeiro against Mead Morrison Manufacturing Company.

It is not claimed that citation to participate in a vistoria is sufficient summons in a suit that may be subsequently commenced. In such cases, under Brazilian law, a new service of summons has to be made. The citation in the vistoria proceedings does not require a defendant to answer to a suit that may follow. The sufficiency of the service of the summons in the suit brought September 4th, and the effect of the subsequent proceedings, is an important field of controversy in this branch of the case.

The officer's return, as translated, ·is as follows:

"I certify that I summoned Morrison Manufacturing Company through their representatives, F. H. Walter & Co., in the person of F. H. Walter, for all the contents of the petition, he became informed and refused to receive the summons. The above is true, to which I certify. Rio, September 4, 1916. The Court Officer, Oldemar Pinto Ferreira Maradô."

On September 14th Walter & Co. filed

a petition in court, saying that, having been summoned as representative of Mead-Morrison Manufacturing Company, "to speak with regard to a common suit for indemnity hereby declare to your excellency that they have already given up the representation of the said corporation, for which reason they are unable to receive initial summons in the cause, their renunciation having been communicated to the principal. In such emergency the supplicants petition that your excellency cause the suit to be stopped, notifying the plaintiff, the Compagnie du Port de Rio de Janeiro, to make summons directly on the corporation at its head office by letters rogatory."

Mead Morrison Manufacturing Company did not appear in the suit, nor did any agent or attorney for it, and the action was defaulted. Before judgment was entered, Walter & Co. were summoned as witnesses, to produce books, etc. In reply they filed another petition, or certificate, saying, among other things:

"They never had in their possession books of Mead Morrison Manufacturing Company, since their intervention was as agents of said company in the contract which they agreed upon with the Compagnie du Port up to the renunciation which they effected previous to the bringing of the action; their intervention as agents of said company being limited, as it was, to the said contract which they made with the Compagnie du Port until they withdrew to the proposal of the suit."

No service was made on Mead Morrison Manufacturing Company, or any of its officers or agents, except as above. Final judgment was rendered against the defendant by the Brazilian court in 1920.

As to whether there was a good service of the writ under the law of Brazil is a violently disputed question. It seems to depend on the interpretation, or perhaps the application, of article 106 of the Code of Brazil, which provides, according to the translation of the plaintiff, that "the defendant being absent from the place where the obligation was contracted, initial citation may be made in the person of his (mandatarios) attorneys in fact, (administradores) directors, (feitores) factors, or (gerentes) managers, in cases in which the action results from acts performed by such attorneys in fact, directors, factors, or managers."

It seems doubtful, from the evidence, whether Walter & Co. could be classed in any of the designations mentioned, especially where the words "representante" or "agente" were not used, and experts in Brazilian law

have testified that the service was defective and void.

On the other hand, an expert for the plaintiff says otherwise, and an opinion of the Supreme Court of Brazil is in evidence, in what is claimed to be a similar case, in which it is authoritatively stated that "he who takes charge of administration of any business in a certain place, in that place must respond, even if he has not his domicile there, because there is a quasi contract, and this obligation is understood to be contracted."

[1] However, it seems that the federal court of Rio decided in this case that the service was good, and it had the question before it, because Walter & Co. protested against the service and moved that the action be dismissed; but it does not follow that this court cannot inquire for itself into jurisdictional questions before giving effect to the judgment.

"As to a foreign judgment it is perfectly well settled that the inquiry is always open, whether the court by which it was rendered had jurisdiction of the person or thing." Thompson v. Whitman, 18 Wall. 457, 21 L. Ed. 897.

"A foreign judgment, to be valid and enforceable, must have been rendered on a service of process which is due process of law within the federal Constitution [Const. Amend. 14]." 34 Corpus Juris, § 1619.

"Whatever difficulty may be experienced in giving to those terms ['due process of law'] a definition which will embrace every permissible exertion of power affecting private rights, and exclude such as is forbidden, there can be no doubt of their meaning when applied to judicial proceedings. They then mean a course of legal proceedings according to those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights. To give such proceedings any validity, there must be a tribunal competent by its Constitution—that is, by the law of its creation—to pass upon the subject-matter of the suit; and, if that involves merely a determination of the personal liability of the defendant, he must be brought within its jurisdiction by service of process within the state, or his voluntary appearance." Pennoyer v. Neff, 95 U. S. 714, at page 733 (24 L. Ed. 565); 8 Ruling Case Law, §§ 442, 444; 12 Corpus Juris, § 956.

[2] In the case of a judgment rendered in one of our states, against a corporation of another state, the preliminary inquiry as to jurisdiction is usually concerned with two

questions: (1) Whether the corporation was doing business in the first state in such a way as to warrant the inference that it was there present; (2) whether the person served was an authorized agent. In the case of a judgment rendered in a foreign country a third question arises, under the doctrine of the leading case, Hilton v. Guyot, 159 U. S. 113, 16 S. Ct. 139, 40 L. Ed. 95, as to whether that country will give conclusive effect to judgments of American tribunals. Other than in respect of this feature of comity, as elucidated by the Supreme Court, the attitude of our courts toward judgments of foreign American states and judgments of foreign countries, where civilized systems of jurisprudence prevail, is substantially the same. The "full faith and credit" provision of our Constitution (article 4, § 1) simply establishes as between the states the rule of comity which the Supreme Court lays down in Hilton v. Guyot as essential to recognition of foreign judgments; consequently the numerous decisions of the Supreme Court relative to the attitude of our federal courts toward judgments of states are pertinent.

Before referring to those decisions, and attempting to apply them, it will be necessary to know the situation in Rio of the defendant, Mead Morrison Manufacturing Company, and its alleged agents, F. H. Walter & Co., at and before the time of service of the writ in the suit upon which the Brazilian judgment was rendered.

It appears that Mr. D. W. Coe, referred to both as chief engineer and as manager of the foreign department of the Mead Morrison Company, went to Rio in 1912, and with the co-operation and assistance of Mr. F. H. Walter, of the firm of F. H. Walter & Co., negotiated and obtained the contract with the Port Company for the construction of the pier.

The contract recites that it is made between the Port Company, "party of the first part, and Mead Morrison Manufacturing Company, represented by their agents, F. H. Walter & Co., of Rio de Janeiro, hereinafter called 'the contractor,' party of the second part."

In one clause of the contract it is stipulated that bills of lading, etc., shall be sent "to F. H. Walter & Co., agents for Mead Morrison Manufacturing Company, who will immediately forward papers to the company for clearance at the customs." The word "company" here refers to the Port Company. It is difficult to make out any signature to the contract. The stamps are canceled by F. H. Walter & Co. The specifications are signed, "Mead Morrison Manufacturing Company, represented by F. H. Walter & Co., D. W. Coe, Manager Foreign Dept.," all being in typewriting except the signature of D. W. Coe. The contract was dated September 9, 1912; the specifications August 29, 1912. The actual work of construction was commenced in February, 1913, and finished in October, 1913, when the pier was turned over to and accepted by the Port Company. So far as appears, neither the Mead Morrison Company nor any subcontractor for it did any work or business of any kind, or had any property or any agents or officers, in Brazil after October, 1913, excepting from this statement all matters relating to F. H. Walter & Co. and the vistoria proceedings above spoken of. No license was granted to Mead Morrison Company to do business in Brazil, although probably one would be implied from the facts, especially where the government was interested in the work. The Mead Morrison Company had previously erected some machinery for a gas company near the location of this pier, but no other work in Brazil, so far as appears.

The record is barren of evidence of any activity and of any connections from which constructive presence in Brazil of Mead Morrison Company could be implied from October, 1913, to June, 1915. On the latter date the vistoria proceedings were begun and carried on as above described. F. H. Walter & Co. appeared for Mead Morrison & Co. at the vistoria proceedings, and employed a lawyer, who also took part in examining the collapsed pier, submitting questions, and reserving the right to submit further questions. Mr. Coe, the manager of the foreign department, left the country before the report of the experts in the vistoria proceedings was filed. At the time of bringing suit and the service on Walter & Co. they notified the officer, and repeated several times afterward that they were not agents of the defendant for any purpose whatever, such agency they previously had having been given up. It appears from the judgment roll that experts appointed to examine the books of Walter & Co. were informed by them that their commercial transactions with Mead Morrison Manufacturing Company were limited solely to representing that company in signing the contract for the construction of the pier, that payments were made directly to Mead Morrison Manufacturing Company in the United States, and not through Walter & Co., and that all previous correspondence referred only to the signature of the contract.

On this evidence the plaintiff maintains that the defendant has not overcome by evidence the presumption of the validity of the judgment and has not shown Walter & Co. were not agents authorized to receive summons in the suit. It relies on various cases, and particularly Hilton v. Guyot, supra, and the following language of Mr. Justice Gray:

"When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is prima facie evidence, at least, of the truth of the matter adjudged, and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that, by the principles of international law, and by the comity of our own country, it should not be given full credit and effect."

[3] The above language was used by the court in a case where there had been an appearance by counsel and a trial on the merits in the foreign country, the defendant there having taken advantage of several opportunities of appeal, and the court is careful to say that the judgment shall be prima facie evidence, "when * * * the foreign judgment appears to have been rendered by a competent court having jurisdiction of the cause and of the parties." Where, as in the instant case, it appears from the judgment roll itself that the action was defaulted without appearance, and that the only service made was on a third person, who refused the summons on the ground that he had no authority to receive it, any presumption of jurisdiction is sufficiently overcome by the record itself to throw the matter open to proof and leave the court free to determine for itself from all the evidence whether jurisdictional facts existed, according to our views of due process of law.

"The presumption in favor of the validity of a judgment does not extend to a case where it appears from the record that the defendant was a nonresident, and it does not appear that service of process was made upon him within the state." Rand v. Hanson, 154 Mass. 87, 28 N. E. 6, 12 L. R. A. 574, 26 Am. St. Rep. 210.

It is held in St. Clair v. Cox, 106 U. S. 350, 1 S. Ct. 354, 27 L. Ed. 222, that to give a foreign judgment the status of prima facie evidence it must appear somewhere in the record, or otherwise, that the corporation was engaged in business in the state, and on that appearing a certificate of service by the proper officer on a person who is an agent would be prima facie evidence that the agent represented the company in the business.

[4] Stripped of supporting presumptions, it seems apparent that there is no sufficient evidence that Walter & Co. were agents of the defendant authorized to receive service of precept. But back of the matter of agency, and of fundamental importance, is the question whether at the time of the service the defendant was doing business in Brazil in such manner as to warrant the inference that it was there present.

"Unless a foreign corporation is engaged in business within a state it is not brought within the state by the presence of its agents." Tauza v. Susquehanna Coal Co., 220 N. Y. 259, 115 N. E. 915, quoted in Chipman, Limited, v. Jeffrey, 251 U. S. 373, 40 S. Ct. 172, 64 L. Ed. 314.

"Jurisdiction over a corporation of one state cannot be acquired in another state or district in which it has no place of business and is not found, merely by serving process upon an executive officer temporarily therein, *even if he is there on business of the company.*" Dickinson Farm Mtgd. Co. et al. v. Carrie M. Harry, 47 S. Ct. 308, 71 L. Ed. ——, decision handed down from Supreme Court January 10, 1927.

In the case of Bank of America v. Whitney Bank, 261 U. S. 171, 43 S. Ct. 311, 67 L. Ed. 594, Whitney Bank, with its usual place of business in New Orleans, had active accounts with several banks in New York City, and its president was temporarily in New York City, and upon him service was made. The court says:

"The sole question for decision is whether, at the time of the service of the process, defendant was doing business within the district in such manner as to warrant the inference that it was present there. * * * The jurisdiction taken of foreign corporations, in the absence of statutory requirement or express consent, does not rest upon a fiction of constructive presence, like 'qui facit per alium facit per se.' It flows from the fact that the corporation itself does business in the state or district in such a manner

and to such an extent that its actual presence there is established. That the defendant was not in New York, and hence was not found within the district, is clear."

The Supreme Court has not given a definition of what is "doing business," but in many cases it has decided as to what is and what is not doing business. In Green v. C., B. & Q. Ry. Co., 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916, the defendant was not operating any railroad tracks in Pennsylvania, where it was sued, but it had a regular office in Philadelphia, with an agent in charge, who was called a district freight and passenger agent, and whose duty was to get business for the railroad. The court held that, while it was doing considerable business there of a certain kind, it was not of the kind which would make the railroad liable to suit there by service on its freight and passenger agent. See, also, Phila. & Reading Ry. v. McKiffin, 243 U. S. 264, 37 S. Ct. 280, 61 L. Ed. 710; St. Louis & Southwestern Ry. v. Alexander, 227 U. S. 218, 33 S. Ct. 245, 57 L. Ed. 486, Ann. Cas. 1915B, 77.

In the instant case, assuming that its subcontractors represented it, so that the defendant was doing business in Rio, while the construction was going on, it ceased doing business and departed from the country more than two years before suit was brought upon which the judgment was rendered. And the only claim that any further business was done afterward is that, when it finished its contract and departed it left a liability in not performing the work according to the contract—a continuing liability, which developed into the suit. The defendant relies strongly on the authority of Conn. Mutual Life Ins. Co. v. Spratley, 172 U. S. 672, 19 S. Ct. 308, 43 L. Ed. 569, where the insurance company ceased doing business in the state where sued, so far as writing new policies was concerned, but left its old policies and continued to collect premiums and pay losses. The court held that it was doing business there. See the later case of Minnesota Ass'n v. Benn, 261 U. S. 140, 43 S. Ct. 293, 67 L. Ed. 573, in which the Spratley Case is referred to.

The Spratley Case should be considered in the light of more recent decisions of the Supreme Court. In Minnesota Association v. Benn, 261 U. S. 140, 43 S. Ct. 293, 67 L. Ed. 573, a judgment was rendered by default against a foreign corporation on process served on a state officer as its agent under the Montana statute, which provided that any corporation organized under the laws of that state or doing business therein may be summoned under certain circumstances by leaving process with the secretary of state, "who shall be and is hereby constituted an agent and attorney in fact to accept service on behalf of such corporation, and service upon said secretary of state shall be deemed personal service upon said corporation."

The court says:

"The Supreme Court of Minnesota followed Wold v. Minnesota Commercial Men's Association (1917) 136 Minn. 380 [162 N. W. 461], wherein the opinion referred to Connecticut Mutual Life Insurance Co. v. Spratley, 172 U. S. 602 [19 S. Ct. 308, 43 L. Ed. 569], and Commercial Mutual Accident Co. v. Davis, 213 U. S. 245 [29 S. Ct. 445, 53 L. Ed. 782], but did not cite Hunter v. Mutual Reserve Life Insurance Co., 218 U. S. 573 [31 S. Ct. 127, 54 L. Ed. 1155, 30 L. R. A. (N. S.) 686], or Providence Savings Life Insurance Society v. Kentucky, 239 U. S. 103 [36 S. Ct. 34, 60 L. Ed. 167, L. R. A. 1916C, 572]. * * * The Montana court was without jurisdiction, unless petitioner by doing business in this state impliedly assented that process might be served upon the secretary of state as its agent.

"Considering what this court held in Green v. Chicago, Burlington & Quincy Ry. Co., 205 U. S. 531 [27 S. Ct. 595, 51 L. Ed. 916], Philadelphia & Reading Ry. Co. v. McKibbin, 243 U. S. 264 [37 S. Ct. 280, 61 L. Ed. 71], People's Tobacco Co. v. American Tobacco Co., 246 U. S. 79 [38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537], and Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U. S. 516 [43 S. Ct. 170, 67 L. Ed. 372], we think it cannot be said that the association was doing business in Montana merely because one or more members without authority to obligate it, solicited new business. That is not enough 'to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the state or district where service is attempted.' People's Tobacco Co. v. American Tobacco Co., supra, 87.

"It also seems sufficiently clear from Allgeyer v. Louisiana, 165 U. S. 578 [17 S. Ct. 427, 41 L. Ed. 832], Hunter v. Mutual Reserve Life Insurance Co., supra, and Providence Savings Life Insurance Society v. Kentucky, supra, that an insurance corporation is not doing business within the state merely because it insures lives of persons living therein, mails notices addressed to beneficiaries at their homes, and pays losses by checks from its home office."

"The general rule deducible from all our decisions is that the business must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present." People's Tobacco Co. v. American Tobacco Co., 246 U. S. 79, 37 S. Ct. 280, 61 L. Ed. 710.

[5] Inasmuch as the defendant did no business of any kind in Brazil after 1913, it cannot possibly be said that it was doing business there in 1916 of such a nature as to warrant the inference that it was there present. The only thing of any kind done by the defendant or any one for it after 1913 was in connection with the vistoria, which was not the business the corporation was engaged in. Engaging in litigation is not "doing business."

"It is well settled that engaging in litigation does not constitute doing business within the meaning of constitutional and statutory provisions against doing business in the state without compliance with the prescribed conditions, requirements, etc." 14a Corp. Juris, p. 1276.

My conclusion in this branch of the case is that the defendant corporation, under the situation disclosed, was not, at the time of the attempted service of the writ, doing business in Brazil under circumstances that warrant the inference that it was there present, and that there was no service of process that would justify a court here in giving conclusive effect to the foreign judgment.

Under count 2 in the writ the plaintiff claims to recover by virtue of the provisions of the Brazilian law making the builder practically an insurer of the solidity of his work for a period of five years.

Section 1245 of the present Civil Code of Brazil, as translated, provides that "in contracts for the construction of buildings or other considerable constructions the contractor who agrees to furnish materials and do the work shall be responsible during the period of five years for the solidity and safety of the work not only by reason of the material employed, but also by reason of the ground, with this exception, if the contractor, not finding the ground firm, seasonably advised the owner of the work."

The legal experts who have testified do not agree upon the scope of this section, some claiming that it is in effect an absolute insurance, and others that acts of God or "force majeure" are excepted; but they all agree that, if in force, it would cover the situation in this case, where there is no question of inevitable accident. The Code, however, did not go into effect until January 1, 1917, and provides that it shall not affect prior obligations.

The testimony of the principal legal expert witness, Alzamora, that section 1245 simply codified pre-existing law and did not change it, is not convincing. Born in Peru, now practicing in New York, he has never been in Brazil, and necessarily gains his knowledge of the law of that country from a study of the decisions of its courts and such text-books as are available.

A study of his testimony gives one the impression that he has not clearly distinguished between the liability of an insurer and liability for negligence.

The only decision referred to by the witness in support of his position is that of Silveira against the Federal Union, where the government undertook to build a police station and in excavating weakened the walls of an adjoining house, the owners of which brought an action against the government for damages. The defendant contended that the damages resulted from the bad condition of the plaintiff's house, and also that it was not liable, because the work had been performed by an independent contractor of recognized competence. The court found the plaintiff's property in good condition and that his building had been caused to crack and crumble through the deep and long excavations made for the foundation of the police station while the plaintiff's building was supported by shoring done by the contractor. The court announced the principal that—

"The contractor is responsible as well to the owner as to the third parties for all the damages resulting from defects of the plan, of the construction, and of the site of the building, because, by reason of his interest in economizing as much as possible in materials and labor, he may be led to commit errors and frauds, or at least, imprudence, and because as a professional, which he must be, he is bound to ascertain and to enlighten the owner regarding the bad conditions of the ground, in the interest of the latter and of the public also.

"Considering, however, that such responsibility ceases when a fault can be imputed to the owner either in the choice of the contractor or in the conditions that he imposed on him by his contract, or when the owner reserved a right of direction and superintendence of the execution of the works, and therefore,

"Considering that the defendant, having in fact effected by contract the construction

of the station adjoining the plaintiff's property, and having, due to absence of necessary precautions, caused the damages suffered by said property, undertook expressly the general inspection and superintendence through an inspector charged according to the terms of the sixth clause of the contract in the matter, as well as in the brief of the defendant itself, the general inspection, the furnishing of the plans, details, and instructions for the execution of the works, and the examination of the materials to be employed;

"Considering that, having taken upon itself, therefore, the supreme direction of the works, the defendant became responsible for all the consequences of the unskillfulness, error, or misfeasance of the constructor, and of the workmen employed by him because he should have foreseen or prevented those faults—that is because of not having properly carried out the inspection and oversight assumed by it."

There is no insurance liability involved in this case. The owner was held responsible to a third party because the owner, through its subcontractor, over whom it retained control, had been negligent in the work of construction.

Mr. Alzamora, in his cross-examination, admits that the case offered by him was not an authority on the question of the builder being held to be an insurer.

"X Q. 8. In that decision there was fault on the part of the contractor, wasn't there?

"A. Yes.

"X Q. 9. It wasn't an insurance liability?

"A. No; it was not."

Other authorities referred to by the plaintiff are text-writers, whose statements are unsatisfactory, in that they do not get away from the elements of unskillfulness or defective construction in considering the liability of the builder.

The quotation from the findings of Judge Kelly in giving judgment for the plaintiff in the Brazilian suit, to the effect that "the responsibility of the contractor is established by our law, even before the promulgation of the Civil Code," and "would be extinguished only if the owner of the completed work failed to enter any claim within a period of ten years," is not persuasive as to the existence of an insurance liability prior to the Code, because he was giving judgment in the case before him, not on that ground (which would have been very simple, if the defendant had been an insurer), but on the ground of dereliction on the part of the defendant, found by the vistoria after prolonged investigation.

Lawyers of evident standing at the bar, now practicing in Brazil, have testified definitely that there was no such insurance liability before 1917. I conclude that there was none, and consequently the second count cannot be sustained.

Other counts in the writ base the plaintiff's right to recover on provisions of the Brazilian law holding the builder liable for five years for faulty construction—the faulty construction being shown by the vistoria report (count 3); on implied warranty of suitableness (count 4); on the agreement in the contract that the defendant shall be responsible for injuries to persons or property due to its negligence (count 6); and on the common money counts (8); but in view of the evidence, including that as to the law of Brazil, I do not find in these counts any satisfactory basis for a finding of liability by the defendant. I am driven to the conclusion that any liability must be on account of a breach of the written contract under which the work was done. This is the more satisfactory because there is little or no dispute as to what is the law of Brazil, outside of the matters above referred to, and we find ourselves in the more familiar fields of the common law, because the law of Brazil, applicable to the rights of the parties under the contract, is practically the same as that of this country.

Article 1056 of the Civil Code of Brazil reads:

"The obligor is responsible for losses and damages if he does not perform his obligation, or if he do not perform it fully as regards manner of performance or time within which performance is to be made."

Article 1057 reads:

"In bilateral contracts, each one of the parties is responsible for fault or negligence."

These provisions embody the pre-existing law.

The questions to be considered now narrow to an examination of the rights of the parties under the first and seventh counts in the writ, based on breach of contract. These counts are the same, except that in one the contract is incorporated by reference, and in the other set forth in substance. The breach of the written contract claimed is that the defendant failed to supply materials of the best quality of the several kinds specified and workmanship of the first class. This applies specifically to the concrete piles which supported the platform of the pier, and which largely broke and caused the col-

lapse of the pier when it was loaded with coal.

The claim that the materials were not good may be eliminated, both for lack of evidence and because the plaintiff's witness, the Brazilian engineer, Dr. Frontin, supported by the other experts who made the investigation for the vistoria, says: "The accident was not due to the bad quality of the substances employed in the construction." Certain errors or omissions in the method of constructing the piles are claimed by some of plaintiff's experts; but inasmuch as it appears that the piles were constructed in accordance with the specifications in all respects (except possibly a minor one of the size of a wire netting, which was waived), we are confined to the matter of driving the piles, in which the plaintiff alleges poor workmanship in using a too heavy hammer and driving the piles when they were too green.

[6] This brings us to the question of the cause of the accident, and as to whether the plaintiff has established a definite cause attributable to the default of the defendant. The burden of proof is on the plaintiff to show that the collapse was due to a breach of the defendant's contract. The work done by the defendant was under the supervision of the plaintiff's engineer, inspected, approved, accepted, and fully paid for long before the accident. The suit is not by the contractor to recover the contract price for performance of his contract. The defendant here has no burden to show what was the cause of the collapse, or that something other than a breach of the contract was the cause. Boston, etc., Canal Co. v. Seaboard Transportation Co. (C. C. A.) 270 F. 525.

The plaintiff's theory that the cause of the collapse was overdriving the recently made concrete piles is not based upon observations and conclusions made by any one at the time of the driving, but is developed by reasoning as to the probable cause of conditions found to exist in the piles immediately after the accident.

The piles having the characteristics described in the specifications are Chenowith piles, so called, the name given to a patented type of pile which is made by spreading fresh concrete on a wire netting and rolling it up around a central iron tube and several solid iron rods, attached together with the wire, all rolled together like a jelly roll and allowed to harden a specified number of days. There is no banding around the concrete to keep it from spreading, and no other lateral reinforcement. The rolling is done by machinery and the concrete made up rather stiff. The piles in this case were 40 to 50 feet long, 18 inches in diameter, with end tapering to 4 inches, a central tube of 3-inch iron pipe, and eight reinforcing rods of one inch in diameter. The completed pile weighed 6½ to 7 tons.

The specifications provide that, after the piles were manufactured, they should be allowed to stand three weeks before being moved "to allow for proper setting of concrete." The man who drove them testifies that they were cured from 30 to 45 days before being driven. The plaintiff's experts assume a period of 25 days, from information they say they gained from various people after the disaster. The driving was with an ordinary pile driver, with a 5,000-pound hammer having an extreme possible drop of 42 inches, but used in this work at about half that height, which is less than half speed. The force of the blow was softened by a wooden block and by a rope cushion about one foot thick placed between the hammer and the top of the pile. The driving was into hard marl. The piles were driven about 6 feet into this, but not to resistance —they could be driven farther. The entrance of the piles into the ground was eased by a jet of water. There was testimony that a representative of the plaintiff, Mr. Lohman, an electrical engineer, who saw the driving, said that the piles were driven carefully and tapped very gently when something hard was encountered. The plaintiff's supervising engineer and his assistants, who inspected the driving as it progressed, were satisfied with it, and approved it as done according to the specifications, which required first-class workmanship.

The piles had been in place about 20 months when they gave way under a moderate load on the pier. On examination it was found that the piles under the destroyed part of the pier were bent and broken, the concrete cracked, and in many cases entirely gone, leaving the rods exposed. The stripping of the concrete and bending of the rods doubtless occurred at the time of the collapse; but it was found that the quality of the concrete had deteriorated, having become crumbly, soft, and easily broken. The sample in evidence shows poor cohesion, and can be easily broken with the fingers; while the sample from the platform of the pier is perfectly hard.

From conditions observed after the disaster, and from information gained in their investigations, the experts relied upon by the plaintiff concluded that the weakness of

the piles was due to faulty construction, and particularly to overdriving into hard bottom when too green.

An engineer called by the defendant developed the theory that electrolysis through seawater—the stray currents of electricity coming from high-power currents running nearby—was at the bottom of the disintegrated and generally poor condition of the concrete in the piles.

From the expert evidence, especially that of Mr. Johnson, called by plaintiff, it can be concluded that the action of seawater on concrete is harmful under some circumstances, and in porous concrete affects its texture directly by softening, and indirectly through rusting of any iron inside, and consequent expansion. This concrete, not being subject to "tamping" in making this sort of pile, was doubtless more porous than the well-tamped concrete in the rest of the structure.

In weighing the evidence supporting the different theories, it should be remembered that the value of the opinion of the expert depends to a considerable extent upon the completeness and accuracy of his information as to the facts. For instance, Dr. Frontin, the spokesman for the three experts of the vistoria, in his report says that from information gathered from other and unnamed sources they learned various important details, like the time of drying before driving, etc. As to this their information differed from the sworn testimony of the man who drove the piles. It seems clear from the Frontin report that they assumed that the hammer of the pile driver was operated at full height, or about 42 inches. The figures Dr. Frontin gives are 1.007 meters, and he makes all his elaborate calculations on that as a basis. The fact, from the uncontroverted testimony of the man in charge, that the hammer dropped from about half that height, would seem to be so vital a factor as to shatter the calculations of the vistoria experts. Also it does not appear, I believe, that Dr. Frontin and his associates knew about the rope and wood cushion on top of the piles, or had knowledge of the statement of the plaintiff's engineer, Mr. Lohman, that the piles were driven carefully and tapped gently when something hard was encountered.

Without considering further on this point the voluminous record, and without distinguishing between fault in the contract (specifications) and fault in the contractor, I conclude that a view of the evidence most favorable to the plaintiff shows that the cause of the collapse might have been due to faulty construction. This, of course, is not enough to sustain the burden of proof. As remarked by the court in Smith v. Illinois Central R. R. Co. (C. C. A.) 200 F. 553:

"It is not enough for plaintiff to show that defendant may have been guilty of negligence. The evidence must point to the fact that it was so negligent. * * * Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; * * *."

[7] Assuming, however, for the purposes of this discussion, that the cause of the accident was due to faulty construction, it remains to separate the fault of the contractor from the fault of the contract.

A certain type and method of construction was called for by the contract. The contractor was not permitted to deviate from this and cannot be charged with its faults.

It was no part of the duty of the experts to make a distinction between faults chargeable to the specifications and faults chargeable to the contractor; nor did they in their testimony make such distinction. In fact, Dr. Frontin in his report took pains to say that they were only considering technical responsibility, and not legal liability.

Many details of construction pointed out as defects are plainly called for by the contract; that term including, of course, the specifications, which were made a part of it.

Several of the plaintiff's engineers criticize the general plan of construction. Dr. Frontin, speaking for the vistoria, says: "We do not consider the system of foundations employed as the most convenient and most appropriate for the nature of the soil."

Dr. Pereira says he was skeptical about the type of pile before the pier was built.

Dr. Frontin and others emphasize as a technical defect the fact that "no hoops were placed at equal distances to counteract the tendency of the material to disintegrate, as a result of the action of the force of compression in the direction of the axis of the pile and the stress due to the blows of the hammer of the pile driver."

As a matter of fact, the piles could not be banded and conform to the specifications.

Dr. Lohman, in his deposition, says that the composition of the samples of concrete in evidence may be due either to hard driving or to the fact that, when made, the concrete was not tamped. The concrete in this type of pile called for by the specifications was not susceptible of tamping.

Mr. Johnson, an expert called by the plaintiff, testified as follows:

"Before manufacture, we have first to consider the design of this pile. If it is as

I understand it, the design is improper, in that the rods are not laterally restrained. That being the case, no excellence in manufacture could have prevented happening what did happen."

The design was specified in the contract and could not be changed by the contractor.

Other witnesses called by the plaintiff consider that the difference in quality of the concrete in the broken piles and in the unbroken platform is due to the fact that the piles were heavily pounded. It does not appear that they have accurate information as to the details of pounding, nor that they were pounded harder than was necessary to drive them in accordance with the specifications, in the place where they were required to be driven, by the contract.

Assuming that the poor condition of the concrete in the piles after the collapse was due to their having been driven with heavy blows into hard bottom, it still must be shown that such driving was unnecessary, or that the severity of driving was beyond what was required to comply with the specifications.

The plaintiff claims that the piles were driven before having dried sufficiently and that this was a violation of the contract.

The specifications provide that "after the piles are manufactured they will be allowed to stand three weeks before they are moved, to allow of proper setting of concrete." If it was intended that there should be a further period of drying, after they could be moved, before being driven, nothing was said about it in the contract or specifications. If it was a matter of judgment and observation as to how soon after the expiration of three weeks they should be driven, the judgment of the constructor was apparently exercised in good faith and under the immediate supervision of the plaintiff's agents, who signified their approval of the proceedings.

It is testified very strongly in behalf of the defendant that such a pile, allowed to harden 28 days, has 80 per cent. of the strength it would have if permitted to continue to harden 6 to 9 months. The contract did not permit waiting that length of time. The superintendent of driving says that 28 days were less than the minimum time any of the piles were dried before driving.

The fact is that we have to guess what was the cause of the accident. If we should guess that it was partly because of heavy pounding, we are met by the fact that there is no proof that they could have penetrated the ground with any less. If we should guess that it was partly due to being driven

before being fully dried, we find that the only drying period called for by the contract was more than met.

Eliminating from consideration the considerable evidence as to an independent cause, i. e., electrolysis, a rather long and careful study of the evidence fails to satisfy me that the collapse was due to any action of the defendant independent of, and not authorized, either expressly or impliedly, by the contract.

It follows that I am obliged to hold that the plaintiff has not made out a case under the first and seventh counts, the last ones to be considered.

The defendant has interposed several affirmative defenses, which it is not necessary to discuss in view of the above findings.

Judgment may be rendered for the defendant.